**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOELENE COBB,**

                                        **Plaintiff,**
        **vs.**

                                                          **1:22-CV-1002**
                                                          **(MAD/CFH)**

**ELLAB INC.,**

                                        **Defendant.**
_____

**APPEARANCES:**                            **OF COUNSEL:**

**PHILLIPS & ASSOCIATES, PLLC**             **STEVEN J. FINGERHUT, ESQ.**
45 Broadway                                 **ZACHARY RANDALL, ESQ.**
Suite 430
New York, New York 10006
Attorneys for Plaintiff

**ANTON AMMAR, PLLC**                        **GARY KRAMER, ESQ.**
600 17th Street
Suite 2800 S
Denver, Colorado 80202
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On September 22, 2022, Plaintiff Joelene Cobb ("Plaintiff") commenced this action

against Defendant Ellab Inc. ("Defendant"), alleging retaliation in violation of the New York

Executive Law § 296 ("New York State Human Rights Law" or "NYSHRL"). *See* Dkt. No. 1 at ¶

2.

On September 7, 2023, Defendant filed a motion for summary judgment, arguing that

Plaintiff has failed to allege that she engaged in any protected activity or that there was any causal

connection between any protected activity and her employment termination, and that even if she had, her claim should nevertheless be dismissed because Defendant had legitimate reasons for ending her employment. *See* Dkt. No. 27-2 at 5.

## II. BACKGROUND

According to the complaint, Defendant is a manufacturing corporation that specializes in manufacturing pharmaceuticals, organized and existing under the laws of Colorado. *See* Dkt. No. 1 at ¶¶ 6, 7. Defendant's Albany location "exclusively supports activities for Defendant's client, Regeneron Pharmaceuticals, Inc." *See* Dkt. No. 27-1 at ¶ 2. There is a trailer on Regeneron's campus where Defendant's employees work closely with Regeneron employees, as well as a separate "off-site office" for Defendant's employees. *See id.* at ¶ 6. Defendant employed Plaintiff, a Black woman, as a Validation Engineer at its Albany location from March 1, 2021, until June 24, 2022. *See* Dkt. No. 27-1 at ¶ 1; Dkt. No. 1 at ¶¶ 2, 11.

Christopher Barner ("Mr. Barner") was the only Senior Validation Engineer at Defendant's Albany location from March 2022 through June 2022. *See* Dkt. No. 27-1 at ¶ 4. Hannah Bowen ("Ms. Bowen") was employed as a Project Coordinator and had sole responsibility for scheduling all work performed by the Defendant's Albany employees. *See id.* at ¶ 5.

In February 2022, Plaintiff received a positive yearly review and a raise from $69,019 to $73,161 annual pay. *See id.* at ¶ 7. In late March 2022, Plaintiff met with Mr. Rogers, the Regional Valuation Engineer who Plaintiff reported to, and Mr. Schwertz, the Operations Manager who Mr. Rogers reported to, as part of Defendant's annual performance review process for all employees. *See id.* at ¶¶ 1, 11. On March 29, 2022, after the performance review meeting, Mr. Schwertz emailed Defendant's President, Tim Paymaster, and Defendant's Director of Human resources, Erik Zotter ("Mr. Zotter"). *See id.* at ¶ 12; Dkt. No. 1 at ¶ 15. In the email, Mr.

Schwertz wrote that Plaintiff's "review was awkward," she "doesn't take me as a hard worker and doesn't have the right mindset for temperature mapping," and expressed concerns that Plaintiff was using the job "to get into Regeneron" and "will be leaving soon[.]"  Dkt. No. 27-13 at 1.

On April 22, 2022, "Mr. Rogers asked Mr. Barner to 'keep an eye on how often [Plaintiff] isn't at her desk today'" because he had observed Plaintiff "disappearing [from her desk] for 30 min to [one] hour at a time" and other team members were unable to find her when they had questions or needed her to make a correction.  Dkt. No. 27-22 at 1.  Plaintiff admitted she was sometimes "away for 30 minutes to one hour," not performing work duties.  Dkt. No. 27-3 at 63.

On May 3, 2022, Plaintiff asked Mr. Rogers if he thought she was "on track for senior validation engineer in March 2023" to which Mr. Rogers replied that the position required "[five] years of overall Validation experience[.]"  Dkt. No. 27-9 at 1.  During that conversation, Plaintiff did not mention concerns about her communication with her coworkers or the need for a DEI program.  *See id.*

On May 17, 2022, Mr. Barner asked Mr. Rogers for guidance on managing Plaintiff's conduct towards her coworkers, and expressed concern that Plaintiff's "decisions haven't always been accurate, and she seems to shut down if you catch a mistake[.]"  Dkt. No. 27-23 at 1.  On May 18, 2022, Mr. Barner told Mr. Rogers that Plaintiff "immediately started today with an argument" and that it was "getting to be a little too much."  *Id.* at 5.  Mr. Rogers responded that Plaintiff "should not be arguing with anyone."  *Id.*  On May 18, 2022, Plaintiff discussed her frustration regarding communication and scheduling with Ms. Bowen with her coworkers.  Dkt. No. 27-3 at 73.

On June 8, 2022, Plaintiff was not included or copied on an email that a Regeneron employee sent inviting Defendant's employees to attend a training meeting for a new building.

*See* Dkt. No. 27-1 at ¶ 20.  Plaintiff's coworkers informed her about the meeting and Plaintiff attended the meeting.  *See id.*  Plaintiff testified that she had to ask a Regeneron employee for assistance to attend the meeting.  *See* Dkt. No. 27-3 at 93.  However, test massages between Plaintiff and her coworkers show that Defendant's employees helped Plaintiff locate and attend the meeting.  *See* Dkt. No. 27-14 at 1-2; Dkt. No. 27-33 at 142.  During the text conversation where Plaintiff's coworkers helped her locate the meeting, Plaintiff made a sarcastic comment that "communication is key!"  Dkt. No. 27-1 at ¶ 22; Dkt. No. 27-14 at 3.  Plaintiff claimed that, Mr. Rogers, who had been in the group text, later told her that "everyone walks on eggshells" around her and that she does not "have to give 110% all the time."  Dkt. No. 27-19 at 1.

One June 10, 2022, a Regeneron employee saw Plaintiff crying outside the trailer and authorized her to work from home for the rest of the day.  *See* Dkt. No. 27-3 at 109.  Mr. Zotter called Plaintiff because he had heard that she was "visibly upset outside of work."  Dkt. No. 27-1 at ¶ 24.  Mr. Zotter and Plaintiff discussed Plaintiff's "interactions and communications with her coworkers and her supervisor," *id.* at ¶ 24, and Mr. Zotter "indicated that Defendant will be taking any matter seriously and are there to help her."  Dkt. No. 1 at ¶ 15.  On June 13, 2022, Plaintiff thanked Mr. Zotter for his compassion.  *See* Dkt. No. 27-28 at 8.

On June 15, 2022, Mr. Zotter and Mr. Rogers spoke about the "situation" and left a message for Plaintiff.  *Id.* at 10.  That same day, Plaintiff called Mr. Rogers to complain that employees of a different contractor at Regeneron were pointing at her and laughing.  *See id.* at 11.

On June 16, 2022, Plaintiff emailed Mr. Rogers to ask if she and Defendant's other employees were authorized to take off four hours the next day in accordance with Regeneron's Juneteenth policy for its Albany employees.  *See* Dkt. No. 27-16 at 1-2.  Mr. Rogers told Plaintiff that according to Defendant's Regeneron contact, Defendant's employees could "tak[e] 4 hours

tomorrow so once work is done and you met your other 4 hours onsite people shall leave work as allows. Unfortunately, we didn't have early notification so the CQ team is going to be extra busy and may need assistance so if others can help that would be great." *Id.* at 1. Mr. Rogers also emailed all of Defendant's employees to inform them that he would be off the next day and to ask the employees to "work together to get everything on the schedule done[.]" *Id.* at 2.

On June 17, 2022, Plaintiff testified that she left work approximately four hours early and did not communicate with Defendant's other employees before leaving. *See* Dkt. No. 27-3 at 174. Plaintiff admitted that she did not ask any of her coworkers if she could help them before she left. *See id.*

On June 23, 2022, Plaintiff and Mr. Zotter discussed her communications with her coworkers and her supervisor and "included some discussion of DEI [(Diversity Equity and Inclusion)]." *Id.* at 196. Plaintiff claims that she told Mr. Zotter that "she did not feel welcomed at [work] and explained that Defendant needed a stronger and more in-depth Diversity and Inclusion program." Dkt. No. 1 at ¶ 17. Plaintiff testified that during the call she reported feeling "ostracized" by her coworkers. Dkt. No. 27-3 at 212.

Mr. Zotter and Mr. Rogers drafted a Performance Improvement Plan ("PIP"), which Mr. Rogers gave to Plaintiff on June 24, 2022, and told her to "provide 'any feedback [she] sees fit' and directed Plaintiff to sign the PIP by 5:00 PM that day." Dkt. No. 1 at ¶ 18; *see* Dkt. No. 27-1 at ¶ 30. The PIP stated that Plaintiff needed to improve her communication with team members, attendance, and attitude. *See* Dkt. No. 27-17.

Several hours later, Plaintiff emailed Mr. Zotter and Mr. Rogers, saying that she found the PIP "confusing and disheartening" and felt that "she has been labeled as aggressive and having an attitude" but was "willing to improve as necessary." Dkt. No. 1 at ¶ 19; Dkt. No. 27-1 at ¶ 38. In

the email, Plaintiff stated that she "look[ed] forward to seeing what Diversity Equity and

Inclusion plan will be laid out to better navigate this toxic work environment so we can proceed

from here because my issues of being isolated by my own team, left out on critical project-related

incidences. . ." Dkt. No. 27-19 at 2. Plaintiff also stated that she felt she was "being

vituperatively labelled as aggressive and having an attitude" but was "willing to improve where

needed[.]" *Id.* at 1. Plaintiff attached a signed copy of the PIP to her email which referenced an

attached addendum, which presumably referred to her emailed comments. *See id.* Shortly after

Plaintiff sent the email with the signed PIP and her comments in response, Mr. Zotter informed

Plaintiff that Defendant was terminating her employment contract. *See* Dkt. No. 27-1 at ¶ 40;

Dkt. No. 32 at 6.

Plaintiff claims that she was retaliated against and unlawfully terminated because she had

made complaints that she was discriminated against at her work. *See* Dkt. No. 1 at ¶¶ 23, 28, 29.

In its motion for summary judgment, Defendant contends (1) that Plaintiff did not engage

in any protected activity; (2) even if Plaintiff did engage in protected activity, that she cannot

show any causal connection between her protected activity and her employment termination; (3)

Defendant terminated Plaintiff's employment for legitimate, non-retaliatory reasons, and (4)

Plaintiff has failed to present any evidence that would permit a rational factfinder to conclude that

Defendant's explanation is merely a pretext for impermissible retaliation and that retaliation was

at least one of the motivating factors for the termination. *See* Dkt. Nos. 27-2, 33. Plaintiff

opposes Defendant's motion. *See* Dkt. No. 32.

### III. DISCUSSION

**A.      Standard of Review**

     ***1. Summary Judgment***

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Courts must use "an extra measure of caution" in determining whether to grant summary judgment in cases that involve retaliation because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and

depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d. Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).  Summary judgment nonetheless remains available in discrimination cases lacking genuine issues of material fact.  *See id.*

### 2. NYSHRL Retaliation

The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(7).

In August 2019, the NYSHRL was amended "to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'"  *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (quoting N.Y. Exec. Law § 300); *see also Ruiz v. Armstrong*, No. 508834/2017, 2024 WL 718532, *4 (N.Y. Sup. Ct. Feb. 2, 2024).  "Prior to August 1[2], 2019, the pleading standards were generally the same for Title VII, section 1981, and NYSHRL claims."  *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (citing *Awad v. City of New York*, No. 13-CV- 5753, 2014 WL 1814114, *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981 . . . and [the] NYSHRL are analyzed under the same framework and pleading standard as Title VII claims")) (other citations omitted).  Before the 2019 amendments, courts adopted the federal standard and held that only retaliation which produced an injury or harm was actionable under the NYSHRL.  *Schiano v. Quality Payroll Sys., Inc.*, 445

F.3d 597, 609 (2d Cir. 2006) (applying the same standards to retaliation claims under the

NYSHRL as federal claims under Title VII).[1]

Substantive case law on the August 2019 amendments to the NYSHRL is limited because

of their recency.  *See Cannizzaro v. City of New York*, No. 656773/2021, 2023 WL 8658823, *8

(N.Y. Sup. Ct. Dec. 15, 2023).   Nonetheless, New York State Courts have recognized that the

amended version of the NYSHRL is "remarkably similar" to the NYCHRL.  *See Hosking v.*

*Mem'l Sloan-Kettering Cancer Ctr.*, 186 A.D.3d 58, 63 n.1 (1st Dep't 2020); *see also Brown v.*

*New York City Dept. of Educ.*, No. 157642/2020, 2023 WL 173201, *9 (Sup. Ct. N.Y Cty. Jan.

12, 2023) ("As the nearly identical language of the NYCHRL has been held to require 'an

independent liberal construction analysis' [ ] that 'broadly. . . favor[s] discrimination plaintiffs, to

the extent that such a construction is reasonably possible' [*sic*] the same treatment must now be

given to the NYSHRL") (internal quotations omitted).   "The case law, however, has not

definitively resolved whether the effect of the 2019 amendment is to make the NYSHRL's

standard identical to that of the NYCHRL—or merely closer to it."  *Yost v. Everyrealm, Inc.*, 657

F. Supp. 3d 563, 578 (S.D.N.Y. 2023) (comparing cases).  Because "the NYCHRL supplies the—

or tied with the NYSHRL for the—most lenient applicable liability standard," for purposes of this

motion, Plaintiff's NYSHRL claim will be analyzed under the NYCHRL standard.  *Id.*; *see also*

*Cannizzaro*, 2023 WL 8658823, at *8; *Syeed*, 568 F. Supp. 3d at 321 (applying the NYCHRL

standard to NYSHRL claims after the 2019 amendments); *Wellner v. Montefiore Med. Ctr.*, No.

17-CV-3479, 2019 WL 4081898, *5 n.4 (S.D.N.Y. Aug. 29, 2019) ("The effect of [the 2019

---

[1] The amended NYSHRL applies to the claims in this case, which postdate the effective date of
the amendment.  *See Mwantuali v. Hamilton Coll.*, No. 6:22-CV-1395, 2024 WL 1219752, *12
(N.D.N.Y. Mar. 20, 2024) (citing L. 2019, ch. 160, § 16).   "The amendment took effect on the
signing date, August 12, 2019, although other parts of the omnibus bill containing it took effect
on October 11, 2019 . . . [and] the amendment does not have retroactive effect."  *McHenry*, 510 F.
Supp. 3d at 68.

NYSHRL amendments] is to render the standard for claims closer to the standard under the NYCHRL"); *Arazi v. Cohen Bros. Realty Corp.*, No. 1:20-CV-8837, 2022 WL 912940, *16 (S.D.N.Y. Mar. 28, 2022) ("After [the 2019] amendment, the standard for [the] NYSHRL [retaliation provisions] aligns with the NYCHRL standard").

"To establish its entitlement to summary judgment in a retaliation case [under either the NYSHRL or NYCHRL], a defendant must demonstrate that the plaintiff cannot make out a prima facie claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual." *Reichman*, 179 A.D.3d at 1119-20 (citations omitted). "Where a defendant produces 'evidence that justifies [his or her] allegedly retaliatory conduct on permissible grounds . . . [t]he plaintiff must either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive.'" *Id.* (quoting *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 741 (2d Dep't 2013)) (citation omitted).

"Under the NYCHRL, unlawful discrimination must play 'no role' in an employment decision." *Ellison v. Chartis Claims, Inc.*, 178 A.D.3d 665, 668 (2d Dep't 2019) (quoting *Singh v. Covenant Aviation Sec., LLC*, 131 A.D.3d 1158, 1160 (2d Dep't 2015)). Therefore, "'a defense motion for summary judgment in an action brought under the NYCHRL must be analyzed under both the familiar framework of *McDonnell Douglas* . . . and under the newer mixed motive framework, which imposes a lesser burden on a plaintiff opposing such a motion.'" *Sanderson-Burgess v. City of New York*, 173 A.D.3d 1233, 1235 (2d Dep't 2019) (quoting *Persaud v. Walgreens Co.*, 161 A.D.3d 1019, 1020 (2d Dep't 2018)); *see also E.E.O.C. v. Bloomberg L.P.*,

10

967 F. Supp. 2d 816, 862 (S.D.N.Y. 2013) (assessing NYCHRL retaliation claim under a mixed-motive analysis).

The first step of the *McDonnell Douglas* framework requires that the plaintiff establish a prima facie case of retaliation. *See Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

> To establish a prima facie case of discrimination on the basis of race under the NYSHRL, a plaintiff must demonstrate that (1) the plaintiff is a member of a protected class, (2) the plaintiff was qualified to hold the position, (3) the plaintiff suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.

*Ellison*, 178 A.D.3d at 668 (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 (2004)) (other citations omitted).

Although both parties incorrectly rely on the Title VII standards in their briefings, *see* Dkt. Nos. 27, 32, 33, when considering a claim of retaliation under the NYSHRL, the Court applies the NYCHRL standard, which "imposes an identical standard" as Title VII, "save for two important exceptions." *Maynard v. Montefiore Med. Ctr.*, No. 18-CV-8877, 2021 WL 396700, *6 (S.D.N.Y. Feb. 4, 2021). The first exception is that, with respect to the third element of a prima facie case of retaliation, the NYCHRL does not require that the plaintiff "'prove any adverse employment action; instead, [s]he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity.'" *Leon v. Columbia Univ. Med. Ctr.*, No. 11-CV-08559, 2013 WL 6669415, *1 (S.D.N.Y. Dec. 17, 2013) (quoting *Jimenez v. City of N.Y.*, 605 F. Supp.2d 485, 528 (S.D.N.Y. 2009)) (other quotations omitted). The second exception is that "'the NYCHRL does not require a plaintiff to show but-for causation. Instead, summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part

in the employer's decision.'" *Maynard*, 2021 WL 396700, at *6 (quoting *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 269 (S.D.N.Y. 2020)).

> [T]o prevail on a summary judgment motion in an action alleging
> discrimination in violation of the NYSHRL, "a defendant must
> demonstrate either the plaintiff's failure to establish every element
> of intentional discrimination, or, having offered legitimate,
> nondiscriminatory reasons for the challenged actions, the absence of
> a triable issue of fact as to whether the explanations were
> pretextual."

*Blackman v. Metro. Transit Auth.*, 206 A.D.3d 602, 604 (2d Dep't 2022) (quoting *Reichman*, 179 A.D.3d at 1117).

"In the context of a case of unlawful retaliation, an adverse employment action is one which might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Reichman*, 179 A.D.3d at 1119 (internal quotation and citation omitted).

The Second Circuit has "suggested that a plaintiff may prevail in a NYCHRL case if discrimination was a partial motivating factor." *Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc., Emp. Benefit Funds*, No. 20-3092, 2021 WL 4851384, *1 (2d Cir. Oct. 19, 2021). However, a plaintiff that "bring[s] a retaliation claim under the NYCHRL still must adduce admissible evidence" to support such a claim. *Forrester v. Corizon Health, Inc.*, 752 Fed. Appx. 64, 66 (2d Cir. 2018) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113, 116 (2d Cir. 2013)) (other citation omitted). Evidence of "temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL," *Forrester*, 752 Fed. Appx. at 66 (citing *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76-77 (2d Cir. 2015)), and neither is speculation. *See Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 322 (E.D.N.Y. 2014).

"Implicit references to unlawful conduct may suffice to establish protected activity." *Marseille v. Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981, *2 (2d Cir. Oct. 26, 2022). "Moreover, the plaintiff 'need not prove that her underlying complaint . . . had merit, but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful.'" *Id.* (quoting *Zann Kwan*, 737 F.3d 834 at 843).  "The New York Court of Appeals has held that 'oppos[ing] any practice' can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of [the defendant's] discrimination by communicating to [him], in substance, that she thought [his] treatment of [the victim] was wrong.'" *Mihalik*, 715 F.3d at 112 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011)).

Should the plaintiff meet this initial burden, the second step of *McDonnell Douglas* shifts the burden to the defendant "to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).

At that point, the *McDonnell Douglas* framework and the mixed motive framework diverge.  *See Hamburg v. New York Univ. Sch. of Med.*, 155 A.D.3d 66, 73 (1st Dep't 2017). Should the defendant demonstrate a legitimate reason for its action, "under the mixed motive analysis, the plaintiff may defeat the defendant's evidence of legitimate reasons for the challenged action by coming forward with evidence from which it could be found that 'unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for [the] adverse employment decision.'" *Id.* (quoting *Melman v Montefiore Med. Ctr.*, 98 A.D.3d 107, 127 (1st Dep't 2012)).

By contrast, the third step of *McDonnell Douglas* then shifts the burden back to the plaintiff to establish that the employer's action was, in fact, "motivated, at least in part, by discriminatory bias." *Id.* at 76. At this third step, "'the presumption of retaliation arising from the establishment of the prima facie case drops' . . . and the 'plaintiff must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer . . . .'" *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 423 (S.D.N.Y. 2018) (internal and other quotations omitted); *see also Ya-Chen Chen*, 805 F.3d at 70. To demonstrate "but for" causation, the plaintiff is not required to establish that "retaliation was the only cause of the employer's action . . . only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.

**B.     Application**

**    1. Prima Facie Case**

**        a. Participation in a Protected Activity**

A protected activity is an "'action taken to protest or oppose statutorily prohibited discrimination.'" *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). "An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011). Protected activity also "extends to more 'informal protests of discriminatory employment practices,' such as 'making complaints to' superiors, 'writing critical letters,' 'protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 246 (S.D.N.Y. 2020) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Plaintiff describes several factors which made her "fe[el] ostracized and isolated by her co-workers, and unnecessarily critiqued solely due to her race" and led her to have a "good faith belief that she was treated differently[.]"  Dkt. No. 32 at 11.  Plaintiff felt "overly critiqued for 'issues' not related to her performance" because of Defendant's employees "fixation" on the possibility that she was trying to pursue employment with Regeneron.  Dkt. No. 32 at 12. Plaintiff has not alleged or testified that the concerns about her retention were related to race.  As Defendant notes, Mr. Schwertz's email where he expressed concerns that Plaintiff planned to leave Defendant's employment was not addressed to Plaintiff and she did not see it until after this litigation had commenced.  *See* Dkt. No. 33 at 3.

Plaintiff testified that she "was forced to endure continued pressures and scrutiny from her co-workers" which other colleagues were not faced with, including when they reported that she "stormed out" of Defendant's trailer and "Plaintiff was the only employee who was critiqued for wearing headphones while in the trailer."  Dkt. No. 32 at 12, 13, 14.  Plaintiff also claims that she was "unfairly critiqued for 'altering' her work schedule while other employees were freely allowed to change their work schedule[s] within certain limits" and that her "co-workers also described her as 'aggressive'[.]"  *Id.* at 13. Plaintiff claims that Mr. Rogers asked Mr. Barner to "keep an eye" on her but other employees were not supervised in that manner.  Dkt. No. 27-3 at 62.  However, Plaintiff does not allege that she complained about any of these behaviors.

"Plaintiff felt that she was being discriminated against because her co-workers were consistently mixing up her name with two other African American employees named Jacqueline Ollison and Margaret Harden."  Dkt. No. 32 at 13.  Plaintiff, whose first name is Joelene, testified that she was only confused with Jacqueline "Jackie" Ollison.  *See* Dkt. No. 32-3 at 184.  Plaintiff testified that she and Jackie spoke together about people mixing their names up but did not raise

the issue with anyone else.  *Id.* at 143-44.  In totality, these circumstances led Plaintiff to feel "that her co-workers were treating her differently as a direct result of her race and felt that her work was undervalued."  Dkt. No. 32 at 14.

Plaintiff believed that she was assigned to be onboarding "buddies" with Margaret Harden, who was not a Validation Engineer, "because they were [both] people of color."  Dkt. No. 32 at 13.  Defendant alleges several non-race-based reasons Ms. Harden was assigned as Plaintiff's "onboarding buddy", including her availability and flexibility.  Dkt. No. 33 at 3.  Defendants reasons are immaterial because Plaintiff testified that she never complained or otherwise engaged in protected activity relating to her assigned onboarding buddy.  *See* Dkt. No. 32-3 at 146-47.  When asked whether she, Ms. Harden, or Jackie "during their employment made any complaint or allegation about race discrimination in employment at Ellab", Plaintiff responded "unfortunately, we did not."  *Id.* at 148.

Based on those allegations, Plaintiff, "in good faith, believed that Defendant Ellab needed a DEI Plan to ensure that individuals of different races would feel that they were accepted and included by Defendant's employees.  Plaintiff simply wanted to be welcomed by her peers and made a complaint to bring this to the attention of Zotter."  Dkt. No. 32 at 13-14.  Plaintiff asked Mr. Zotter what Diversity and Inclusion programs the company had, and after Mr. Zotter responded, Plaintiff "stated that it needs to be more than just a policy and one time training" and that "she felt she was the 'token diverse person.'"  Dkt. No. 32-9 at 3.  During that meeting Plaintiff also told Mr. Zotter that she felt showing up was "Stockholm Syndrome" and that she "tells herself it['s] not that bad and keeps showing up, because she wants to make things better for future Ellabbers so they don't have to experience it."  Dkt. No. 32-9 at 4.  According to Mr. Zotter's notes from their conversation, Plaintiff told Mr. Zotter that she "didn't want to continue

checking in with HR and wished none of this happened." *Id.* Although Plaintiff's comment that she felt she was the "token diverse person" presumably refers to her membership in a protected class, she did not claim that that feeling was due to any of Defendant's practices rather than an internalized feeling. Rather, Plaintiff felt isolated and tokenized on her team of around ten people. *See* Dkt. No. 33 at 5. However, expressing her feelings without complaining about any practice that caused those feelings is not an expression that she believed her employer had engaged in a form of employment discrimination, nor is it a request for accommodation. *C.F. Littlejohn*, 795 F.3d at 317 (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (internal quotations omitted)) ("'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity'"); *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 331 (S.D.N.Y. 2020) (holding that protected activity "may also include requests for reasonable accommodation").

These facts do not demonstrate that Plaintiff had a good faith belief that she was complaining about an employment practice that she reasonably believed violated the law. Even if Plaintiff's request that Defendant implement a DEI program was construed as a complaint about the lack of such a program, Plaintiff has not alleged that she reasonably believed that a DEI program was a legal requirement. Instead, she alleges that she "believed that . . . the implementation of a DEI Plan would allow all individuals to work together efficiently." Dkt. No. 32 at 14. Plaintiff's alleged comments are not protected activities because "'[m]ere complaints of unfair treatment . . . are not protected speech' in the employment retaliation context," where the Plaintiff has the burden "to clarify to the employer that [s]he is complaining of unfair treatment

due to h[er] membership in a protected class and that he is not complaining merely of unfair treatment generally." *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (quoting *Brantman v. Fortistar Capital, Inc.*, No. 15-CV-4774, 2017 WL 3172864, *7 (S.D.N.Y. July 22, 2017)). Additionally, this was a generalized complaint which Defendant would not have reasonably understood to be a complaint about conduct prohibited by the NYSHRL. *See Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011).

Plaintiff claims that she engaged in protected activity during her performance review meeting with Mr. Rogers and Mr. Schwertz at the end of March 2022 when Plaintiff "expressed" that she "was feeling isolated in the trailer." Dkt. No. 32-2 at 55. However, while Plaintiff testified that she "could have brought up that [she] was beginning to feel ostracized and isolated[,]" she admitted that she did not mention her race when she met with Mr. Rogers and Mr. Schwertz towards the end of March. Dkt. No. 32-3 at 150-51. Plaintiff's expressed feelings of isolation do not satisfy the "'requirement that the employer have been aware of the protected activity'" because there was no basis for Defendant to have understood "'that the plaintiff's opposition was directed at conduct prohibited by' the NYSHRL." *Benzinger*, 447 F. Supp. 3d at 124 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Plaintiff testified that during "the PIP meeting with Mr. Rogers" she told him that she "felt that [she] was being targeted because of [her] race directly." Dkt. No. 32-3 at 239-40. In response, Defendant admitted that "[i]f this testimony were truthful, it would clearly demonstrate protected activity[.]" Dkt. No. 33 at 6. Because neither Plaintiff's complaint nor any submissions from Plaintiff allude to this explicit complaint that she was discriminated against because of her race, Defendant questions the credibility of Plaintiff's testimony. *Id.* at 7. The Court must draw all reasonable inferences in Plaintiff's favor, and therefore, for purposes of this motion, the Court

will not question the credibility of Plaintiff's testimony that she specifically complained about race discrimination to Mr. Rogers during her PIP meeting.  *See Chambers*, 43 F.3d at 36. Plaintiff's comment to her immediate supervisors that she faced racial discrimination raises a single triable issue of fact as to whether she was engaged in a protected activity.  *See Bilitch v. New York City Health & Hosps. Corp.*, 194 A.D.3d 999, 1005 (2d Dep't 2021); *see also Daniels v. Kijakazi*, No. 22-CV-6297, 2023 WL 3901987, *7 (S.D.N.Y. June 8, 2023) (quoting *Hatch v. Brennan*, 792 Fed. Appx 875, 879 (2d Cir. 2019) (quoting *Littlejohn*, 795 F.3d at 317)) ("protected activity may consist of informal actions such as 'making complaints to management'").

The parties do not dispute the second or third elements of Plaintiff's prima facie case of retaliation; that Defendant had knowledge of the protected activity and that Plaintiff suffered an adverse employment action when she was fired.  *See* Dkt. No. 33 at 7.  To the extent Plaintiff seems to argue that the PIP itself was an adverse employment action, such arguments fail because Plaintiff has not alleged any protected activities before the meeting where she was issued the PIP and therefore she cannot claim that she was given the PIP in retaliation for engaging in protected activity.

### b. Causal Connection

Plaintiff can show the causation element of a prima facie claim of retaliation either (1) "indirectly through circumstantial evidence such as disparate treatment of other similarly situated employees"; (2) "directly through evidence of retaliatory animus directed against [P]laintiff by [D]efendant"; (3) "or by showing that the protected activity was followed closely by the adverse employment action[.]"  *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987).

Plaintiff has not presented evidence of Defendant's retaliatory animus.  Nor has she

presented evidence of disparate treatment, such as by showing that other similarly situated

employees complained to their managers but were not fired.  Plaintiff testified that she

complained about racial discrimination in the meeting where she was presented with the PIP, and

she was fired the next day.  *See* Dkt. No. 32 at 17.  This is sufficient to establish that she is

entitled to a presumptive inference of such causation based on the temporal proximity between

the protected activity and the termination.  *Livingston v. City of New York*, 563 F. Supp. 3d 201,

248 (S.D.N.Y. 2021) (holding that the "[p]laintiff's reliance on temporal proximity may be

sufficient to establish a prima facie case of retaliation" where the plaintiff's protected activity was

one week before he was referred for discipline).

### 2. Nondiscriminatory Justification

The second step of *McDonnell Douglas* shifts the burden to the defendant to demonstrate

that a legitimate, nondiscriminatory reason existed for its action.  *See Meiri v. Dacon*, 759 F.2d

989, 997 (2d Cir. 1985) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981))

("Because establishment of the prima facie case creates an inference that the employer unlawfully

discriminated against the employee, the burden then falls upon the employer to produce evidence

that the employee was discharged for a legitimate, nondiscriminatory reason").

Defendant had observed that Plaintiff had several performance issues which led to the

need for a PIP and then Plaintiff's eventual employment termination.  Defendant has established

that it had legitimate, non-retaliatory reasons to end Plaintiff's employment.  Defendant

"reasonably concluded that Plaintiff's continued employment was counterproductive and would

drive more of her coworkers to leave the company." Dkt. No. 27-2 at 17.  Plaintiff testified that

she would leave the workplace for up to an hour while taking personal calls, which Defendant

was aware of at the time. *See* Dkt. No. 32-3 at 66. Mr. Rogers and Mr. Barner had discussed

with Plaintiff concerns that she was "aggressive" and Mr. Rogers was concerned that she was

arguing with coworkers on May 18, 2022. *Id.* at 68-71. Co-workers had reported that Plaintiff

"was yelling and causing a scene on site [on May 18] and talking about how upset she was with . .

. scheduling." *Id.* at 73. Mr. Rogers asked Mr. Barner to "keep an eye on" Plaintiff because her

supervisors were concerned about her leaving the trailer. *Id.* at 140. They were also concerned

by at least one incident when Mr. Rogers had to "tap [Plaintiff] on the shoulder because [she was]

wearing [her] headphones and w[as] not aware of the fact that there was a conversation going on

that [she] needed to be a part of[.]" *Id.* Mr. Rogers had spoken with Plaintiff about her refusal to

do team lunches, which were not mandatory, as well as team building exercises to train to be up

to date on the customer's requirements. *See id.* at 98-99.

Defendant presented Plaintiff with a PIP on June 24, in an effort to "try to fix these

problems[.]" Dkt. No. 32-5 at 109. The PIP outlined three categories which Plaintiff needed to

improve; "she needed to improve her communication with the team, be present in the workplace

when required, and stop talking down to her coworkers and treat others with respect." Dkt. No.

33 at 9. Mr. Rogers testified that during the PIP meeting Plaintiff "said she would not sign [the

PIP], would not agree to it and sign it[,]" screamed at him, was disrespectful, aggressive, and

treated him terribly. Dkt. No. 32-5 at 110-12, 121. During the meeting, Plaintiff said that she did

not trust members of the team and was not going to participate in team-based activities. *Id.* at

159. Mr. Rogers further testified that "when she refused to sign the PIP and treated me the way

she did, that's when I was in communication to see the next steps." *Id.* at 120. Defendants felt

that during the PIP meeting and in the email she sent with the signed PIP, Plaintiff "rejected any

responsibility for her own conduct, blamed Ellab management and argued with the PIP's

21

substance.  She attacked Mr. Rogers for having 'vituperatively labelled [her] as aggressive and having an attitude' and accused Mr. Zotter of bad faith."  Dkt. No. 33 at 10.

Although Plaintiff did sign the PIP within the timeframe given to her, her interactions with Mr. Rogers during the PIP meeting led him to consult with Mr. Schwertz and Mr. Zotter and decide to terminate her employment before she responded with the signed PIP and her feedback on it.  *See id.* at 109-12.  Mr. Rogers testified that "after the PIP [meeting he] had decided that" she would be fired.  Dkt. No. 32-5 at 121.  Mr. Rogers testified that Plaintiff's interactions during the PIP meeting were a reason but not the only reason for her termination.  *Id.* at 138.

In addition to demonstrating Plaintiff's workplace conduct that led to the need to give her a PIP, Defendant has also established Plaintiff's inability to get along with her coworkers and supervisors as a reason for her employment termination.  This represents a legitimate, non-retaliatory reason for the employment decision.  *See Memisevich v. St. Elizabeth's Med. Ctr.*, 443 F. Supp. 2d 276, 284 n.9 (N.D.N.Y. 2006) (quoting *Meiri*, 759 F.2d at 997) ("[P]laintiff's disputes with co-workers are evident of personality conflicts, and it has been held that 'the profound inability to get along with co-workers is legitimate, non-discriminatory reason for an employment decision'"); *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 343 (S.D.N.Y. 2001) ("The failure of an employee to get along with coworkers rebuts the employee's prima facie case even if the employee's performance ratings were high in other respects.  Courts cannot second-guess an employer's business judgment"); *Williams v. McCausland*, No. 90-CV-7563, 1995 WL 548862, *13 (S.D.N.Y. Sept. 15, 1995) ("Specifically, refusal to obey superiors, inability to get along with coworkers, and failure to complete work in a timely manner are each, standing alone, sufficient to rebut a prima facie case").

### 3. Unlawful Motive

Plaintiff has not met her burden to present evidence from which it could be found that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor" for firing her. *Hamburg*, 155 A.D.3d at 73. Plaintiff has several critiques of Defendant's reasons for firing her, none of which suggest a discriminatory motivation. Plaintiff argues that Defendant's explanation that her employment was terminated because of her workplace conduct did not concern her "actual performance of her job duties." Dkt. No. 32 at 20. Plaintiff's claim that she was "meeting the expectations that were required of her" is belied by the PIP which laid out three specific areas that she was not meeting expectations, including presence at the work site. *Id.* Plaintiff argues that "Defendant Ellab has not illustrated a single deficiency in Plaintiff's work product." *Id.* However, Plaintiff acknowledged that she "was told orally that there were some issues with her interactions with her co-workers." *Id.* Plaintiff's arguments that Defendant's justifications were pretextual misconstrues Defendant's reasons for terminating her employment, which include her communication issues with coworkers and supervisors. *See, e.g.,* Dkt. No. 32-6 at 43. Plaintiff argues that Defendant's concerns about her interactions with her co-workers were "simply exaggerations and [an] attempt to portray Plaintiff as an 'aggressive' person . . ." Dkt. No. 32 at 20. Plaintiff's argument that her "interactions with her co-workers were difficult" because she "felt isolated and ostracized" only sheds light on Plaintiff's feelings and supports the allegations that she was unable to get along with her coworkers. *Id.* at 20-21. Plaintiff's feelings do not show that Defendant's decision to terminate her employment was motivated by unlawful discrimination.

Plaintiff also alludes to an incident where she complained that her co-workers were laughing at her, Defendant conducted an investigation into the incident, concluded that it was unrelated to Plaintiff, and "Plaintiff still had the subjective experience that her co-workers were

laughing at her." *Id.* at 21.  Plaintiff argues that this instance "cannot possibly be described as a

performance issue and Plaintiff stated that she appreciated [Mr.] Roger's assistance and the fact

that he took the time to look into the matter." *Id.*  Plaintiff's allegations that her co-workers were

laughing at her does not relate to Defendant's decision to fire her and does not offer any indication

that Defendant was partly motivated to fire her for retaliatory or discriminatory reasons.  To the

contrary, Plaintiff's allegations suggest that Defendant was seriously considering and responding

to complaints that Plaintiff made.

      Plaintiff points out that Mr. Rogers testimony that Plaintiff was screaming at him during

the PIP meeting is contradicted by the notes he sent to Mr. Zotter and Mr. Schwertz after the PIP

conversation because he did not mention Plaintiff screaming in those notes.  *See id.* at 22.

Plaintiff admits that she was crying during the PIP meeting "because she was very emotional" but

argues that she "maintained a professional attitude towards [Mr.] Rogers." *Id.*  Although

Plaintiff's testimony raises questions about what exactly happened during the meeting, it does not

suggest anything which indicates that Defendant had a retaliatory motive in firing her or that she

had not indicated unwillingness to engage with the PIP.  Plaintiff has not alleged that Mr. Rogers

or any other employees referenced Plaintiff's comments about DEI.  Nor has she suggested that

her telling Mr. Rogers during the PIP meeting that she was racially discriminated against

contributed to the decision to fire her.  *See* Dkt. No. 32-3 at 239-40.  Plaintiff's submissions do not

even refer to the only protected activity she engaged in; telling Mr. Rogers during the PIP meeting

that she was racially discriminated against.  Likewise, Plaintiff's impeachment of Mr. Rogers

testimony about the time frame he gave Plaintiff to sign the PIP is not relevant to whether Mr.

Rogers had an impermissible reason for recommending that her employment be terminated after

the PIP meeting.  *See* Dkt. No. 32 at 23.

Plaintiff has offered nothing but speculation that Defendant's challenged action was motivated, even in part, by unlawful discrimination or retaliation, "and such speculation is insufficient to defeat summary judgment."  *Ellison v. Chartis Claims, Inc.*, 178 A.D.3d 665, 669 (2d Dep't 2019) (citing *Grella v. St. Francis Hosp.,* 149 A.D.3d 1046, 1049 (2d Dep't 2017); *Trovato v. Air Express Intl.,* 254 A.D.2d 349, 350 (2d Dep't 1998)).

The mixed motive framework is a lower burden for the plaintiff to meet than the *McDonnell Douglas* third step, which requires the plaintiff to show that the defendant's nondiscriminatory reason for the adverse action is pretextual and *in fact* motivated by discriminatory retaliation.  *See Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 313 (E.D.N.Y. 2014) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008)); *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000).  Therefore, since Plaintiff has failed to meet her lower burden under the mixed motive framework, she will not be able to establish that Defendant's reasons for firing here were pretextual under *McDonnell Douglas* either.

Accordingly, Plaintiff's claims that Defendant retaliated against her are dismissed.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 27) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 2, 2024
      Albany, New York

Mae A. D'Agostino
U.S. District Judge